IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.C.

No. 1 CA-JV 23-0035
FILED 12-31-2024

Appeal from the Superior Court in Maricopa County
No. JD41139
The Honorable Robert Ian Brooks, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix, Tucson
By Dawn R. Williams
*Counsel for Appellee*

**OPINION**

Chief Judge David B. Gass delivered the opinion of the Court, in which Presiding Judge Michael J. Brown joined. Judge Andrew M. Jacobs dissented.

**G A S S**, Chief Judge:

¶1          Mother appeals the superior court's order terminating her parental rights to her child.

¶2          Mother gave birth to the child in October 2020, nearly four years ago. Mother had not yet finished high school. Mother exposed the child in utero to marijuana and to an untreated sexually transmitted disease. Those exposures caused the child to develop significant medical issues. One month after giving birth, mother took the child to the emergency room because of weight loss.

¶3          The Department of Child Safety first received a hotline report about mother and the child three months after mother did not show up for follow-up appointments. The Department then worked with mother under an in-home safety plan, permitting a relative to supervise mother's parenting.

¶4          When the child was nine-months old in July 2021, the child was again hospitalized for failure to thrive. At that point, the Department sought, and the superior court ordered, an out-of-home dependency. The child has been in care ever since. The Department specifically and separately alleged in its petition that mother neglected the child by not providing for the child's "nutrition and medical care"; not providing for the child's "basic needs, such as food, shelter, clothing, proper supervision, *and/or* medical care"; and by not "properly treat[ing] her [own] mental health." (Emphasis added.)

¶5          Over the next eighteen months, mother made almost no progress toward reunification though the Department continuously offered her services. After the child turned two years old, the Department moved to terminate mother's parental rights. In its termination motion, the Department alleged mother had neglected the child based on mother failing to feed the child properly despite knowing how to do so and mother failing to address her mental health and substance abuse issues. The Department further alleged the six-months-in-care (and later fifteen-months-in-care) grounds based on mother's failure to participate in a variety of services offered to her. As of the termination adjudication, held more than two years after the child came into care, mother had neither meaningfully participated in nor completed a single reunification service offered to her.

¶6          The superior court's decision, like most decisions terminating parental rights, is not woven with a single thread. The court based its

findings of the fifteen-months-in-care ground on a tapestry of facts and issues woven together to create an image. In its order granting the motion to terminate, the superior court noted the Department alleged four independent bases requiring out-of-home care for the child: mother's (1) substance abuse, (2) mental health, (3) inability to recognize and meet the child's basic needs, and (4) inability to meet the child's medical needs. Sufficient evidence supports a finding of mother's inability to parent, independent of whether she could meet the child's medical needs. The Department's failure to advise mother about the child's medical appointments may have marginally inhibited her ability to meet the child's medical needs. But that failure is not dispositive.

¶7            As the superior court determined, clear and convincing evidence of three statutory grounds (other than not meeting the child's medical needs) supports the termination. This evidence includes mother's ongoing substance abuse and her failure to treat her mental health issues —including cannabis use disorder—both of which adversely affected her ability to parent. And those problems were unlikely to resolve in the near future after the adjudication, which was held more than two years after the child came into care. The superior court did not clearly err when it found the Department made diligent, though imperfect, efforts to reunify mother with the child or when it found the termination was in the child's best interests.

¶8            We affirm.[1]

## FACTUAL AND PROCEDURAL HISTORY

¶9            This court views the evidence in an appeal from a superior court's order terminating a parent's rights "in a light most favorable to sustaining" the order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016); *Michelle M. v. Dep't of Child Safety*, 243 Ariz. 64, 66 n.2 (App. 2017) (citing *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 95 ¶ 10 (App. 2009)).

---

[1] The issuance of this opinion has been delayed because of disclosure issues at the superior court. On October 23, 2023, the Department moved to stay this appeal because of disclosure issues. The court lifted that stay when the Department said the disclosure issues were resolved. On September 23, 2024, just as the court was about to issue this opinion, the Department again asked to stay the appeal because of disclosure issues. That stay has now been lifted.

**I. The Superior Court ordered, and the Department continuously offered, services throughout the in-home dependency and the out-of-home foster placement until the superior court terminated mother's parental rights when the child was more than two years old.**

¶10     As expressed in its report for the initial dependency hearing, the Department expected mother to learn how to provide proper care for the child. Proper care included not abusing substances in a way that prevented caring for the child, getting help for mental health issues impeding her ability to care for the child, understanding and meeting the child's basic needs, and ensuring the child attended medical appointments. At that point, the hospital was providing mother and the child support in several ways, including the help of specialists to assist with the child's medical needs: a dietician, gastrointestinal doctor, home health nurse, and care coordinator.

¶11     Months after the child's birth, the Department engaged mother in an in-home safety plan in which a relative supervised mother's parenting. But the child was hospitalized at least seven times for failure to thrive before the child was nine months old and often needed an implanted feeding tube.

¶12     At nine months, the child was hospitalized again, representing her eighth documented hospitalization. Though mother stayed in the hospital with the child this time, she could not meet the child's needs even in that tightly controlled setting. And the Department learned the supervising relative had violated the safety plan by leaving the child alone with mother. At that point, the Department concluded mother's inability to care for the child threatened the child's life. The Department took the child into care, placed the child with a foster family, and filed an out-of-home dependency petition. The superior court found the child dependent as to mother and adopted a family reunification case plan.

¶13     When the child was 22 months old and after the Department had offered services for more than a year, the superior court changed the case plan to termination and adoption. The Department then moved to terminate mother's parental rights on neglect and six-months-in-care grounds. *See* A.R.S. § 8-533.B.2 (neglect), B.8.(b) (six months). On the first day of the adjudication hearing, the Department orally moved to amend its motion to add a fifteen-months-in-care ground. *See* A.R.S. § 8-533.B.8.(c). Mother objected, and the superior court took the request "under advisement." On the second day of the hearing, 29 days later, the superior

court granted the original oral motion after mother's counsel said the extra allegation would not have changed mother's presentation and would not prejudice mother. The next month, after the child had spent almost two-thirds of life in an out-of-home placement, the superior court granted the Department's motion to terminate mother's parental rights on both the neglect and fifteen-months-in-care grounds. In support of the time-in-care ground, the superior court found mother could not parent because she could not "address her child's basic needs, medical needs, and [her own] ongoing use of marijuana."

¶14 During the years of the Department's involvement, mother at most minimally engaged in reunification services. Indeed, mother had not completed even one Department-offered service by the filing of the termination order. And the Department had offered, and re-offered, reunification services throughout the process, including:

1. Family connections, to provide resources and support;

2. Nurturing parent program, to provide parenting education and skills;

3. Facilitated visitation, to help maintain mother's relationship with the child throughout the dependency;

4. Drug testing, to ensure mother addressed her substance abuse issues, specifically with marijuana;

5. Terros substance abuse assessment and treatment, to address her substance abuse issues;

6. Case management, to coordinate services, including new referrals and re-referrals;

7. Transportation, to help mother participate in services;

8. Psychological evaluation, to identify underlying mental health issues and appropriate counseling and other services to address them; and

9. Counseling, to help mother address her mental health issues.

¶15 Mother had not addressed her substance abuse or mental health issues by the termination adjudication. Mother also had not taken the opportunities she had to learn how to meet the child's basic needs, let

alone the child's significant medical needs, of which mother knew essentially nothing.

## II.  Mother never remediated her substance abuse or mental health issues.

¶16        Mother's substance abuse and mental health issues were central to the Department's involvement from the beginning. During closing argument at the termination adjudication, the superior court asked Department counsel whether mother's anxiety, depression, and marijuana use caused the Department concern for mother's ability to parent—independently of mother's handling of the child's special medical needs. Counsel answered yes and affirmed they were distinct issues affecting mother's overall ability to supervise and care for the young child. Counsel argued those separate issues would be important even if a child did not have the special needs. That point informed the superior court's analysis of the effect of mother's substance abuse and unresolved mental health issues on her ability to parent.

### A.  Though the Department offered mother many services and opportunities to treat her substance abuse, mother's efforts fell short, and her continuing substance abuse adversely affected her ability to parent.

¶17        Mother's marijuana abuse harmed the child even before birth. During pregnancy, mother exposed the child to the drug in utero. Mother's continual marijuana abuse after the child's birth adversely affected her parenting. During the termination adjudication, mother belatedly acknowledged she needed to stop using marijuana because of how it affected her ability to parent. Mother said she did not parent "the right way" when she used marijuana because she would focus on other things instead of the child.

¶18        Even so, mother used marijuana throughout the dependency and termination proceedings. Mother obtained a medical marijuana card in 2021 for treatment of back pain. But she used marijuana to self-medicate for depression, anxiety, and general stress. And the Department remained concerned about mother's marijuana use because of the child's vulnerability and mother's tendency to fall asleep while caring for the child, even during supervised visits.

¶19        When the child was around eighteen months old, mother tested positive for methamphetamine. Over the ten months from October 2021 to July 2022, mother submitted to drug testing inconsistently and

missed almost all tests. And she tested positive for marijuana for five out of her seven completed tests in July 2022. When the child was more than two years old and the termination adjudication pending, mother said she was using three grams of marijuana twice a day.

¶20        The Department also offered mother services through provider Terros. Terros recommended group therapy, individual counseling, drug screens, "friends and family night," case management, and medical marijuana group education. Mother attended one medical marijuana group education session. When Terros tried to follow up with mother about missed sessions, mother said she did not care. Terros terminated mother's services for lack of engagement.

¶21        The Department offered mother individual therapy with Terros. But rather than work with Terros, mother contacted a different service provider, where she began individual therapy in July 2022. And even then, mother attended just six of the twice-monthly appointments over the next ten months.

¶22        Mother knew the Department wanted her to stop using marijuana or "have a safety plan in place" to protect the child when she did use marijuana. Even so, mother admitted she had been using marijuana until two weeks before the second day of the termination adjudication. And she did not participate in any of the recommended substance-abuse treatments during her two weeks of sobriety. Instead, mother said she called some agency to try to get into a "marijuana group" the day before the second day of the termination adjudication, but she could not remember the name of the agency.

> **B.    Mother failed to address the mental health issues interfering with her ability to parent, even though the Department offered her many services and opportunities to do so.**

¶23        Mother's mental health raised concerns throughout the dependency and termination proceedings. It was one of several issues central to the Department's involvement from the beginning. Mother had been in counseling with Chicanos Por La Causa for a lengthy period and self-identified as suffering from attention deficit hyperactivity disorder, depression, and anxiety. When the child was seven months old, Chicanos Por La Causa accepted mother's request for counseling for depression at least once a month. But mother attended the sessions inconsistently and eventually stopped attending altogether. Unbeknownst to the Department,

Chicanos Por La Causa ended mother's counseling services after her therapist made several unsuccessful attempts to contact her. When the Department found out, it referred mother for a psychological evaluation in February 2022. But mother did not attend the evaluation, and the provider could not reach mother to reschedule. Mother did not attend any counseling sessions from September 2021 until July 2022.

¶24　　　Mother attended one group medical marijuana educational session in July 2022 but missed several later sessions and did not respond to Terros's repeated attempts to contact her. She also did not engage in medical marijuana group therapy. Terros finally reached her at the end of July 2022 and asked her about her missed sessions. Mother responded she did not care and forgot about the group because she does not need it. Mother's continual marijuana use, as described above, caused further concern because of her substance-abuse history and the child's extreme vulnerability. As the child continued to lose vision and hearing, the child lost the ability to detect danger or seek protection if endangered by mother being under the influence.

¶25　　　When the child was 21 months old, mother told the Department she was still struggling with depression, so the case manager referred her for a second psychological evaluation. The examination led to a guarded prognosis for mother's ability to parent the child in the near future. The examining psychologist recommended mother participate in substance-abuse testing and treatment and establish sobriety for at least six months. He also recommended mother engage in the nurturing parenting program. Because of those concerns, the psychologist "recommended [mother] demonstrate the ability to consistently meet both her own and her [child]'s needs; including providing appropriate housing, items needed to care for her [child], and consistently attending all of her [child]'s medical appointments, for a minimum of 6 continuous months prior to returning a child to her care."

¶26　　　Consistent with those recommendations, the Department re-referred mother to the nurturing parenting program and Terros. Mother did not complete her intake for the new Terros referral before the adjudication hearing months later. Mother was just halfway through the nurturing parenting program by the adjudication hearing, and the program provider reported mother had made "little to no progress."

**III.    From the child's birth through the termination adjudication, mother showed an inability to provide for the child's basic needs along with an inability to meet the child's significant medical needs.**

      **A.    The Department sought an out-of-home placement because mother was not caring for the child's basic needs and the child's extra medical needs because of mother's substance abuse and mental health issues.**

¶27      From the beginning, mother struggled to feed the child and meet the child's medical needs. To assist mother, the Department arranged for her to receive therapy and medication monitoring through Chicanos Por La Causa and services through Family Connections. Those services were on top of the hospital-provided care coordinator, dietician, pediatrician, gastrointestinal doctor, and home health nurse assigned to support her in caring for the child. At most, mother minimally participated in those services. For example, mother's Family Connections services closed in August 2021 because the provider reported mother "does not follow through with scheduled appointments" and "consistently no-shows, cancels, or minimally engages" in meetings.

¶28      The child was hospitalized at least eight times between birth and August 2022 for failure to thrive and sometimes required tube feeding in the hospital. When the child was hospitalized at nine months because of mother's inadequate care and feeding, mother stayed at the hospital with the child. There, hospital staff often had to wake mother to feed the child. When hospital staff could not wake mother, they cared for the child themselves. And mother could not properly feed the child, even with help from hospital staff.

¶29      Mother generally could not provide for the child's basic and medical needs, even with help from a care coordinator and several specialists. Among other things, mother failed to take the child to the doctor when the child's feeding tube fell out. Once, the child suffered an infection that lingered for months because mother could not consistently medicate the child. Mother missed the child's medical appointments and failed to set up needed therapies. As a result, the child missed developmental milestones and suffered progressive vision and hearing loss.

### B. Mother failed to take reasonable steps to learn about the child's medical needs.

¶30 We agree the Department should have, but failed to, advise mother of the child's medical appointments. But mother admitted she was aware of at least some medical appointments because the foster family or her aunt and uncle told her about them and about the results. Indeed, mother's aunt and uncle took the child to many medical appointments while the child was periodically in their care, but mother accompanied them just once. Mother also had access to the child's medical records and court reports discussing the child's needs throughout the dependency and termination proceedings.

### C. Mother never took an active interest in caring for the child.

¶31 The child's foster family and aunt and uncle sought sign-language classes, a special school, and other services to meet the child's significant needs. Mother, however, neither helped with nor participated in those efforts. Mother showed her disengagement at the termination adjudication when, even though she knew the child had been wearing hearing aids for six months, mother acknowledged the child's hearing therapy was "new to [her]."

¶32 Mother did not consistently visit the child and often cancelled or missed visits, left early, or fell asleep during visits. For example, in November 2021, the visitation supervisor's notes showed mother missed visits for three consecutive weeks. Even when she attended supervised visits, mother did not engage with the child.

¶33 This Court has jurisdiction over mother's timely appeal under article VI, § 9, Constitution of Arizona, and A.R.S. §§ 8-235.A, 12-120.21.A.1.

## DISCUSSION

¶34 The Arizona Supreme Court recently reiterated this court's "consequential yet narrow duty" when reviewing a superior court's order terminating a parent's rights. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 481 ¶ 47 (2023). *Brionna J.*'s explanation guides our analysis:

> [W]e reiterate the well-established principle that a juvenile court's legal conclusion that a statutory ground for termination has been proven by clear and convincing evidence will be affirmed unless "clearly erroneous." In clarifying what "clearly erroneous" means, we unremarkably

reiterate that this finding will be affirmed unless the appellate court determines as "a matter of law that no one could reasonably find the evidence to be clear and convincing." For nearly seventy years, . . . this Court has consistently concluded that this is the appropriate standard of review for a decision that must be based on clear and convincing evidence.

This well-accepted legal principle is hardly evanescent, and the clarified standard set forth herein simply provides guidance to appellate courts tasked with a consequential yet narrow duty in reviewing termination cases.

*Id.* at 481 ¶¶ 46–47 (citations omitted). Because the superior court is in the best position to evaluate the testimony, this court will not reweigh the evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009).

¶35　　　The superior court terminated mother's rights on neglect and fifteen-months-in-care grounds. Because we affirm the termination based on the fifteen-months-in-care ground, we need not address the neglect ground or the State's statutory interpretation argument it need not provide rehabilitative services for the superior court to find that ground. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251 ¶ 27 (2000).

¶36　　　Under A.R.S. § 8-533.B.8.(c), the superior court may terminate a parent's rights to a child when (1) the child has been in a court-ordered out-of-home placement for a cumulative period of fifteen months or longer, (2) the Department has made a diligent effort to provide the parent with appropriate reunification services, (3) the parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, and (4) the evidence establishes it is substantially likely the parent will be unable to exercise proper and effective parental care and control in the near future. *See also Brionna J.*, 255 Ariz. at 474 ¶ 1.

¶37　　　The fifteen-months-in-care ground differs significantly from the six- and nine-month grounds. The six- and nine-month grounds focus on the parent's *effort* toward remediation rather than the *outcome* of those efforts. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 329 ¶ 20 (App. 2007). As long as a parent has not "substantially neglected or wilfully refused" to remedy the circumstances leading to out-of-home placement, a court cannot terminate the parent's rights under six-months-in-care or nine-

months-in-care grounds, even if those circumstances are not remediated. *Id.* at 330 ¶ 21; A.R.S. § 8-533.B.8.(a)–(b).

**¶38** In contrast, the fifteen-months-in-care ground hinges not on a parent's effort but on the parent's actual success or failure in remediating the circumstances causing the out-of-home placement. *See id.* at 329–30 ¶ 21. Because the superior court terminated mother's parental rights on the fifteen-months-in-care ground, the focus moves from the level of the parent's efforts to whether those efforts remedied the circumstances causing the child to be in an out-of-home placement and whether the evidence shows it is substantially likely the parent will be unable to exercise proper and effective parental care and control in the near future. *See* A.R.S. § 8-533.B.8.(c).

**¶39** To terminate a parent's rights under the fifteen-months-in-care ground, the Department must prove by clear and convincing evidence it made "a diligent effort to provide appropriate reunification services." A.R.S. § 8-533.B.8; *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 190 ¶ 25 (App. 1999). The juvenile court must "consider the totality of the circumstances when determining whether [the Department] has made diligent efforts." *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 49 (App. 2019). To meet its obligation, the Department must "identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* at 23 ¶ 50 (emphasis omitted). Even so, for forty years, this court consistently has recognized the Department need not provide services if doing so would be futile. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 236 ¶ 20 (App. 2011) (citing *Maricopa Cnty. Juv. Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 189 (App. 1984)). As discussed below, unlike the dissent, we do not abandon that forty-year history. *See infra* Dissent ¶¶ 62–71.

**I.** **The superior court did not clearly err when it found the Department made diligent efforts to provide mother with appropriate reunification services.**

**¶40** Throughout the proceedings, mother was told she had to understand and address the child's specific medical needs. And she was told other issues also were keeping the child in care. She concedes in her brief, "Throughout the family-reunification attempt, [the Department's] primary concerns were [m]other's mental health management, marijuana

use, and ability to meet [the child's] special medical needs." During the termination adjudication, the Department also argued mother could not provide even for the child's basic medical needs, separate from the child's unique medical challenges. Even so, mother only challenges the superior court's diligent-efforts finding. More specifically, mother argues the Department failed to make diligent efforts to provide appropriate reunification services tailored to help her understand the child's specific medical needs.

¶41          The Department argues mother's opening brief does not challenge the Department's diligence in providing services for the other issues adversely affecting mother's ability to parent the child: her long-term substance abuse, her unaddressed mental-health issues, and her ability to provide for the child's most basic needs. And mother filed no reply brief to address those other issues. *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577–78 ¶ 5 (App. 2017).

¶42          Mother has waived any challenge to the superior court's findings on those three issues. *See id.* As this court noted in *Crystal E.*, the Department "should not be expected to address unraised contentions and we, in an exercise of judicial restraint and in furtherance of judicial economy, should not attempt to analyze and decide arguments that have been abandoned and waived." *Id.* at 578 ¶ 7. On that basis alone, we would affirm.

¶43          Waiver aside, reasonable evidence supports the superior court's findings. The Department identified the causes of the child's out-of-home placement and offered mother services to remedy them.

A.     **Reasonable evidence supports the superior court's finding by clear and convincing evidence that mother failed to address her substance abuse.**

¶44          Marijuana usage clouded mother's parental judgment from the day the child was born, substance-exposed to marijuana. Years later at the adjudication, mother acknowledged she focused on other things instead of the child when she used marijuana while attempting, but failing, to provide proper care for the child.

¶45          Mother's continuing substance abuse is evident even as of the first day of the termination adjudication. She said she had a medical marijuana card for back pain. But she acknowledged using marijuana throughout the case for other purposes, most recently six grams a day,

which she attributed to coping with her father's passing in October 2022. The evidence also establishes mother had a cannabis-use disorder.

¶46    Mother knew she had to address her substance abuse to reunify with the child, but she did not take the needed action during the more than two years before the termination adjudication. Instead, she waited until the day before the termination hearing, testifying she then called an unidentified agency to ask about marijuana group therapy. And mother never developed a safety plan to protect the child from her medical marijuana use.

¶47    Mother persisted abusing substances despite the Department's diligent efforts to help her overcome them. Over more than two years, the Department referred and re-referred mother for testing and treatment. Mother tested inconsistently, and the tests she took were often positive for marijuana. She also tested positive for methamphetamine one time. Terros engaged mother and referred her for multiple treatments, therapy, testing, and educational programs. But mother chose not to engage for two years. True enough, Terros cancelled one intake appointment mother finally scheduled two weeks before the termination adjudication and more than two years after the child was born. But mother failed to remedy her substance abuse not because her provider cancelled one appointment but because of her own extended delay. And the superior court was not required to give much weight to mother's eleventh-hour compliance efforts. *See Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994) (concluding parent's successful addiction recovery "too little, too late").

¶48    Nothing in the record suggests it was likely mother would overcome her substance abuse to "be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533.B.8.(c). And her substance abuse was one circumstance causing the child to be in out-of-home care from the beginning.

### B.    Reasonable evidence supports the superior court's finding by clear and convincing evidence that mother failed to address her mental-health issues.

¶49    Like her substance abuse, mother's unaddressed mental-health issues adversely affected her ability to parent the child.

¶50    Mother had been in counseling for many years. She suffered from depression, anxiety, and attention deficit hyperactivity disorder. Even during the dependency mother had suicidal ideations and urges to

physically harm herself. Mother acknowledged her counselor at Chicanos Por La Causa wanted her to work on her anxiety and depression. And mother herself acknowledged she needed counseling to work on those issues. Mother even said she followed her Chicanos Por La Causa counselor to another agency because she felt comfortable with her. Yet mother stopped all counseling shortly after the Department removed the child and did not resume it until almost a year later. Even then, mother had only six telephonic counseling sessions during the ten months before the final termination adjudication date, with lengthy gaps between them. During her last session before the termination adjudication, the counselor said mother seemed distracted. On the day of the termination adjudication, mother had not seen a counselor in more than a month.

¶51 Mother's failure to address her mental-health issues was not for want of diligent efforts by the Department. The Department offered multiple psychological evaluations to identify mother's underlying mental-health issues and worked to establish appropriate counseling and other services to help mother address her underlying mental health. Mother simply did not make the effort. As a result, she now can point to nothing in the record to suggest she has managed her depression, anxiety, or cannabis-use disorder to such an extent it is "likely" she will "be capable of exercising proper and effective parental care and control in the near future." *See* A.R.S. § 8-533.B.8.(c).

### C. Reasonable evidence supports the superior court's finding by clear and convincing evidence that mother could not care for the child's basic needs.

¶52 Mother never demonstrated she could provide for the child's basic needs. Early on, mother struggled to feed the child. Even when mother stayed with the nine-month-old child in the hospital, the nurses had to wake mother and cue her to feed the child and take care of the child's other basic needs. At times, they could not wake mother and had to feed the child themselves. Throughout the dependency and termination proceedings, mother was inconsistent in her visits. She cut visits short. She did not bring food, treats, or activities for the child. At one visit shortly before the termination adjudication, she was so distracted she let the child fall and "bust open her lip." And even after the fall, she went back to playing a game on her phone for the rest of the visit.

¶53 Mother's challenges continued despite the Department's efforts to help her. The Department referred her to Family Connections for resources and support. The Department made several referrals to the

nurturing parenting program to provide mother with parenting education and skills. Mother never completed the program. More than two years after the child was born, mother was halfway through her second attempt, and even then, the provider reported mother had made "little to no progress." The Department provided case management to coordinate services. But mother did not engage. Mother said she lacked transportation, but the Department provided it to help her participate in services.

¶54      The focus of the fifteen-months-in-care ground is whether the "parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement" after the Department has provided diligent reunification services to address its concerns. A.R.S. § 8-533.B.8.(c). Mother did not remedy the circumstance of her inability to care for the child's basic needs after the Department had provided diligent reunification services to address it. *See Brionna J.*, 255 Ariz. at 474 ¶ 1.

> **D.      Reasonable evidence supports the superior court's finding by clear and convincing evidence that mother continually lacked knowledge about—and could not meet—the child's specific medical needs.**

¶55      Mother had more than two years to learn about the child's medical needs. She did not.

¶56      For the first nine months, mother could have learned first-hand while providing direct care for the child. She understood her ability to care for the child's medical needs was critical. Even so, the child ended up in the hospital over and over because mother did not provide for the child's care. When the child was nine months old, the Department sought out-of-home placement because the child's health was at risk in mother's care. Mother again knew the importance of learning the child's medical conditions and how to care for them.

¶57      For more than two years, mother had access to the child's medical records and court reports discussing the child's needs. As of the adjudication, she did not know what the child's conditions were. Indeed, though mother knew the child had hearing aids for six months, at the adjudication, mother said the child's hearing therapy was "new to [her]."

¶58      Mother knew about at least some the child's medical appointments. The foster family or her aunt and uncle told her about them and their results. Indeed, mother's aunt and uncle took the child to many medical appointments while the child was periodically in their care, but mother only ever accompanied them twice. And she said her aunt would

tell mother about the appointments when mother could not go to them. At the adjudication, mother acknowledged she could not even take the child to her required medical and therapy appointments, saying she would need to have the Department continue to help with transportation. Mother simply was not ready.

¶59　　　　With all that, the superior court considered mother's knowledge and abilities at the time of the adjudication. The court concluded the Department's notifying mother of medical appointments would have been "futile" because of her failure to engage in all other services and her failure to take advantage of many opportunities she did have to learn about her child's medical needs through medical records, court proceedings, and her relatives:

> The Department never advised Mother of the child's medical appointments. Mother at hearings and foster care review board meetings regularly requested to be advised of medical appointments so that she could participate in those appointments and understand the child's medical needs better. The Court has considered whether the Department's failure to provide this notice rendered their efforts less than diligent and unreasonable. **Given Mother's failure to participate in multiple services, the Court finds that even if the Department had provided Mother with the dates of those appointments, it would not have moved Mother closer to reunification and would have been futile.** First, the Court finds it unlikely that Mother would have participated. Second, Mother had abundant access to the child's medical history and records and—based on her own testimony—still had no idea what the child's various medical needs were as of the date of trial. Contained within every court report in this case is, at a minimum, a summary description of the Child's extensive needs. Provided as exhibit 11 is the Child's medical records with Children's Rehabilitative Services. Mother does not appear to have reviewed any of those records, despite them being available to her. Finally, Mother's family was attending many of the medical appointments. The burden to provide services is always on the Department; here, however, the Department did provide many services, and Mother simply failed to take advantage of many options to learn about her child's needs.

(Emphasis added.)

**¶60** The superior court issued a supplemental order making clear it found the above by clear and convincing evidence. Consistent with the superior court's finding, reasonable evidence shows mother would not have attended any appointments if the Department had told her about them. She attended only two she did know about. And no evidence shows mother would have understood the child's medical needs any better if she had received notice of appointments specifically from the Department, precisely because the evidence shows she did not go to the appointments she did know about. And she did not read the medical and therapy records she did have. She did not understand the child's need for hearing therapies even though the child was barely two years old and wearing hearing aids.

**¶61** Based on the above, we cannot say, "as a matter of law that no one could reasonably find the evidence to be clear and convincing." *Brionna J.*, 255 Ariz. at 481 ¶ 46 (quoting *Murillo v. Hernandez*, 79 Ariz. 1, 9 (1955)). Still, the superior court's specific findings on this one point neither support nor negate its other findings of mother's inability to parent. Even if the superior court had erred, its other findings of mother's inability to parent based on substance abuse, unaddressed mental-health issues, and inability to recognize and meet the child's basic needs are enough to support its termination decision.

> **E. The superior court did not err when it terminated mother's parental rights even though the Department failed to give mother notices of the child's medical and therapy appointments.**

**¶62** Mother argues the Department "failed to comply with A.R.S. § 8-846." To comply, she argues, the Department had to "prove an aggravating factor by clear and convincing evidence at an evidentiary hearing conducted for that purpose." *See* A.R.S. § 8-846.D; Ariz. R. P. Juv. Ct. 340. She then says, "Instead, the [superior] court improperly circumvented A.R.S. § 8-846 and Rule 340 by simply purporting to find any additional efforts 'futile' in the termination order."

**¶63** As the Department points out, mother is not the first to make this argument. *See Christina G.*, 227 Ariz. at 236–37 ¶¶ 21–25. The mother in *Christina G.* also argued A.R.S. § 8-846 and then Rule 57 (now Rule 340), Arizona Rules of Procedure for the Juvenile Court, required the

Department[2] to secure a court order before it could cease providing services. 227 Ariz. at 236 ¶ 21. This court rejected that argument:

> But nothing in the statute or rule requires [the Department] to request such a hearing if it intends to continue to provide services, as was the case here. Nor does any language in § 8-846 or Rule [340] suggest that the juvenile court is prohibited from making a determination after the severance hearing that *additional* services would have been futile.

*Id.* at 237 ¶ 25 (emphasis added).

¶64 Mother argues she did not waive her right to challenge whether the Department made diligent efforts. But she did waive her right to seek relief under A.R.S. § 8-846 and Rule 340 because she, like the mother in *Christina G.*, did not ask the superior "court to conduct a hearing to determine whether [the Department] could suspend services or refrain from providing them" and so "waived the argument absent fundamental error." *See id.* at 237 ¶ 23. Here, as in *Christina G.*, the superior court did not fundamentally err by failing to conduct such a hearing *sua sponte*. *Id.* at 247 ¶ 24.

¶65 With that understanding, we focus, as *Brionna J.* mandates, on our "consequential yet narrow duty in reviewing" mother's termination case. *See* 255 Ariz. at 481 ¶ 47. Mother was well aware she needed to address her child's specific medical needs from the day the Department became involved. She knew of that requirement throughout the dependency and the termination. And mother and her counsel were well aware the Department had not offered the service about which mother now complains—notice of the child's medical and therapy appointments. She also knew she needed to address her substance abuse, mental health, and inability to recognize and meet the child's basic needs. The superior court did not clearly err when it found the existence of the fifteen-months-in-care ground.

¶66 To be sure, the Department should have given mother notice of the child's medical and therapy appointments. But that error does not

---

2 Since this court ruled in *Christina G.*, the Department of Child Safety replaced Child Protective Services and became independent of the Arizona Department of Economic Security. For continuity and readability, we refer to the Department, even if at the time the agency was Child Protective Services.

warrant reversal. Even when this court in *Christina G.* assumed without deciding the Department "failed to make diligent efforts to provide sufficient reunification services," it still concluded "the record support[ed] the juvenile court's determination that continuation of services would have been futile." 277 Ariz. at 235 ¶ 15. Though the Department did not provide one service it should have given mother, the Department undisputedly provided many services to mother during the dependency and the termination proceedings. *Id.* at 237 ¶ 24. And here, as in *Christina G.*, the superior "court recognized as much each time it made a finding that [the Department] had made diligent efforts to provide reunification services." *See id.* And mother never objected to those findings here.

¶67 The dissent focuses on *Mary Ellen C.*, a case in which this court reversed the superior court because the Department did not make diligent efforts. *See* 193 Ariz. at 192–93 ¶¶ 35–36, 42. In *Mary Ellen C.*, the Department did not provide services for almost a year after removing the child from the mother's care. *Id.* at 192 ¶ 35. After taking a year to schedule a psychological evaluation, it waited another three months to direct the mother toward therapy. *Id.* It provided no other service even though its own psychologist recommended intensive psychiatric services. *Id.* Rather, the Department gave the mother a "phone number, encouraged her to self-refer, and never followed up sufficiently to secure . . . records of her progress." *Id.* Sixteen months after the evaluation, the Department had provided just six counseling sessions. *Id.* at 192 ¶ 36.

¶68 Those facts stand in stark contrast to the robust, though imperfect, services the Department offered mother here. The Department offered mother services from the moment it became involved. And when mother's referrals closed out because she did not participate, the Department made new referrals. Unlike what happened in *Mary Ellen C.*, the Department here provided mother the opportunity to succeed and made a "concerted effort to preserve" the parent-child relationship when it offered the services it did. *See id.* at 192 ¶ 37. Though the Department fell short on keeping mother advised of the child's medical and therapy appointments, the superior court did not clearly err when it found notice of the appointments would not have made a difference because mother rarely attended the appointments even when she knew about them. And mother did not take advantage of other opportunities to learn about the child's significant medical needs.

¶69 The dissent also posits "*Jessie D.* requires us to hold that the lack of any effort by [the Department] to invite mother to [the child]'s medical appointments, much less a diligent effort, violates her

constitutional right to due process." *See infra* Dissent¶ 116 (citing *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574 (2021)). We do not read *Jessie D.* to hold the Department to a standard of perfection. *Jessie D.* stands for the common-sense proposition the Department cannot deny a parent all services in certain circumstances. 251 Ariz. at 581 ¶ 20. This court recognized that point in *Jessie D.* when it said, denying all services "is contrary to the well-settled axiom that severance of the parent-child relationship should be resorted to only when concerted effort to preserve the relationship fails." *Id.* (cleaned up).

¶70　　　　　Consistent with *Jessie D.*, the superior court resorted to termination of the parent-child relationship only after the Department's "concerted effort to preserve the relationship fail[ed]." *Id.* The Department did not deny mother all services. It provided services to address the three other issues it saw as impeding mother's ability to parent: her substance abuse issues, mental health, and ability to meet the child's basic needs, like simple feeding. Though the Department failed to advise mother of medical appointments, mother did not address even one of those other major concerns independent of her attending medical appointments. And the evidence shows mother did not go to medical appointments even when she knew about them. To reverse under the totality of the circumstances of this case would suggest we hold the Department to a standard of perfection. A parent could avoid termination if the Department overlooked a single service, even when, as here, the provision or not of that service has no bearing on the circumstances supporting the termination.

¶71　　　　　The facts before us in the light of this court's long-standing, forty-year precedent overwhelmingly support the superior court's order terminating mother's parental rights.

**II.　　The superior court did not abuse its discretion when it found termination of mother's parental rights was in the child's best interests.**

¶72　　　　　Mother argues the superior court erred when it found termination was in the child's best interests.

¶73　　　　　The superior court must determine what is in the best interests of the child by a preponderance of the evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005). Once the superior court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the superior court then balances the unfit parent's "interest in the care and custody of his or her child . . . against the

independent and often adverse interests of the child in a safe and stable home life." *Id.* at 286 ¶ 35. "[A] determination of the child's best interests must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990) (emphasis omitted). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148 ¶ 1 (2018).

**¶74** The superior court may find a child would benefit from termination if the Department has developed an adoption plan or the child is adoptable. *Id.* at 150–51 ¶¶ 13–14. The same is true if the child "would benefit psychologically from the stability an adoption would provide." *JS-501904*, 180 Ariz. at 352. On the other hand, the superior court may find a child would be harmed by the continuation of the parent-child relationship if "there is clear and convincing evidence of parental unfitness which has not been remedied notwithstanding the provision of services by [the Department] and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989).

**¶75** Mother challenges the superior court's finding termination in the child's best interests, but she does not challenge the superior court's other findings: the child is with a foster family who meets the child's basic and special needs, wishes to adopt the child, and can provide the child with permanency and stability. These findings are enough to support the superior court's determination.

**¶76** Still, mother argues the superior court should have given her extra time to participate in reunification services because the Department failed to invite her to the child's medical and therapy appointments. But the superior court expressly considered "the fact that [the Department] did not provide [m]other with adequate notice of the [c]hild's medical appointments" and "whether it [was] in the [c]hild's best interests to provide mother with additional time to participate in services." The superior court found termination of mother's parental rights was in the child's best interests because "the [c]hild is young and in need of not only stability, but a home that can meet [the child's] medical needs every day. Mother has never been able to and will not be able to do so in the near future." Reasonable evidence supports those findings, and this court will not reweigh the evidence on appeal. *Jordan C.*, 223 Ariz. at 93 ¶ 18.

## CONCLUSION

¶77        The superior court did not rely for its termination decision on the single thread of evidence of mother's failure to meet the child's advanced medical needs. The decision was a layered and complex tapestry woven with multiple threads of evidence of different and independent indications of mother's inability to parent, including substance abuse, mental-health issues, and an inability to meet or even recognize the child's most basic needs. Though the Department fell short in notifying mother of the child's medical appointments, pulling that one thread does not unravel the whole of the decision. Even if mother knew the times of the child's medical appointments, that knowledge alone would not resolve her substance abuse, manage her mental health, or enable her to meet the child's basic needs.

¶78        We affirm.

**J A C O B S, J., dissenting:**

## INTRODUCTION

**¶79** The State took mother's child away because Mother was initially unable to care for her daughter's special medical needs. The State's termination petition shows it filed this termination proceeding for that reason and the record shows it remained principally about that core subject, notwithstanding the State's and the Opinion's efforts to make it about other subjects. Remarkably, despite that core basis for termination, the State never invited Mother to any of her daughter's medical appointments, even as she constantly asked to attend them. The State's failure to do so defeated any reasonable argument that the State provided the services the United States Constitution requires the State to provide before it could take J.C. away from Mother. *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982); *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579 ¶ 18 (2021) (quoting *Santosky* and finding reunification efforts required in "any state attempt to overcome" a parent's liberty interest).

**¶80** Never mind the State's refusal to give Mother a chance to learn to meet her daughter's needs, this court answers – it would be futile to let Mother attend the appointments. She would not fulfill her child's needs anyway, given her depression and legal marijuana use (ignoring that any mother would be depressed if the State abrogated her constitutional rights by depriving her of a chance to learn how to win her daughter back). This circular and self-serving reasoning ignores and defeats Mother's federal constitutional right to parent her child, which is reason enough to reverse. Only our insular legal culture could unironically explain to the public that by keeping Mother walled out of her child's medical appointments, the State somehow provided the constitutionally required "reunification services" needed to let it take her daughter away. But the decision to take J.C. from Mother also rests on this court's extra-statutory "futility doctrine," which the Arizona Supreme Court has never relied upon or approved, and which is found nowhere in the Arizona Revised Statutes. For these reasons, I respectfully dissent, and would require the superior court to allow Mother to attend her child's medical appointments, and then to assess any further request to terminate her parental rights over J.C.

## FACTS AND PROCEDURAL HISTORY

**A.**    **After a Report That Mother Was Unable to Meet J.C.'s Special Medical Needs, DCS Made a Plan That Mother Would Learn to Meet J.C.'s Needs By Attending Medical Appointments to Better Understand Them.**

¶81    J.C. was born with several medical issues in part because of a condition afflicting Mother that she had failed to treat.  Mother also exposed J.C. to marijuana *in utero*.  In October 2020, J.C. was born below average weight and failed to thrive, partially because Mother was not feeding her properly or timely.  At that time, Mother failed to follow up with the infant's doctor appointments and therapy assessments.  Mother, then 19 years old, faced her own mental health issues, including attention-deficit hyperactivity, depression, and anxiety disorders.

¶82    DCS's intervention in Mother's relationship with J.C. began on February 4, 2021, when "the Department received a report that Mother was unable to medically care for her child."  DCS implemented an in-home safety plan in which a relative was to supervise Mother's parenting.  DCS's plan recognized that the "[s]ervices and behavioral changes [Mother] needed" to make the plan work included Mother consistently attending J.C.'s medical appointments.  Indeed, DCS's plan called for "[Mother to] makes sure that [J.C.] makes it to all of her medical appointments**."**  From that constant attendance, Mother would come to understand and meet each of J.C.'s medical and special needs, so she could "demonstrate the[se] learned skills during visitation with" J.C.  DCS called Mother's presence in and learning from the medical appointments a condition necessary for her to demonstrate effective parenting and reclaim her full parental rights.  It wrote in a later report to the juvenile court that Mother's "Behavior Change Goal Needs" included Mother being "able to identify how her . . . lack of engagement in J.C.'s medical appointments has effected [sic] [J.C.]".

¶83    DCS referred Mother to services to help her parent, in which Mother inconsistently participated at first.  Mother received therapy and medication monitoring through Chicanos Por La Causa and services through Family Connections, including a care coordinator, dietician, pediatrician, gastrointestinal doctor, and a home health nurse assigned to support her in caring for J.C.  Mother struggled with properly feeding J.C. and following up with her medical needs.  Around then, J.C. weighed in the first percentile on the growth charts.

¶84 Mother's inconsistent participation in her own counseling continued, and she struggled with feeding J.C. By January 2021, J.C. had been hospitalized seven times for failure to thrive and often required a feeding tube in the hospital. J.C. gained weight during her hospital stays but lost weight at home in Mother's care. Meanwhile, Mother struggled with depression and self-harm urges. Mother's provider recommended counseling at least once a month, but she attended sessions inconsistently and eventually stopped attending altogether. In July 2021, J.C. was hospitalized again. Mother stayed with J.C. in the hospital, but could not meet the infant's needs. Hospital staff frequently had to wake Mother up to feed J.C. and, at times, they could not wake her, so they cared for J.C. themselves. Mother also failed to give J.C. medication for two infections, causing one to persist for months. Because J.C. was failing to thrive, she started missing developmental milestones and experiencing progressive vision and hearing loss. DCS felt Mother's inability to keep J.C. fed and growing could lead to grave harm if not ameliorated.

### B. DCS Asked the Court to Declare J.C. Dependent, Relying Substantially on Mother's Inability to Meet J.C.'s Specialized Medical Needs, But Did Not Invite Her to Any of J.C.'s Medical Appointments.

¶85 On July 23, 2021, DCS petitioned the juvenile court to declare J.C. dependent, in substance because Mother was not then able to provide for J.C.'s special medical needs. DCS's dependency petition was substantially premised on "Mother [being] unwilling or unable to provide proper and effective parental care and control by neglecting to provide proper and effective parental care and control by neglecting to provide for the child's nutrition and medical care." The first half of DCS's explanation in the petition as to why Mother's continued care of J.C. would be contrary to her welfare consisted of discussions of Mother's inability to care for J.C.'s special medical needs. DCS's petition criticized Mother's parenting abilities by noting her need to better follow medical instructions of a dietitian, a pediatrician, medical staff, a primary care physician, and hospital staff.

¶86 DCS kept the focus for Mother's improvement on her ability to improve in handling J.C.'s special medical needs. In a report to the juvenile court dated December 3, 2021, DCS's list of changes Mother needed to make repeatedly called out the need to assure that J.C.'s special medical needs would be met. The report opined that Mother must "utilize[] her resources to assist in ensuring [J.C.'s] medical and basic needs are met . . . ." In a later paragraph on the same page, DCS reported that Mother must "understand[] her child's medical needs and [be] equipped to

provide and follow through with any and all medical recommendations. [Mother must] understand[] what is needed to continue with [J.C.'s] medical appointments to ensure [J.C.'s] safety and development." In a third separate paragraph on that page, DCS wrote that Mother needed to be able to "articulate the importance of being involved in [J.C.'s] medical needs and . . . not allow a lapse in attending [J.C.'s] medical appointments." As DCS wrote, these improvements were all "necessary in order for the parent . . . to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as designed in the case plan)."

¶87 Notwithstanding how central J.C.'s special medical needs were to her dependency, and the acknowledged necessity for Mother to attend all of J.C.'s medical appointments, DCS never invited Mother to any of J.C.'s medical appointments.

### C. DCS Urged Mother to Address Her Emotional and Substance Use Issues Through Services During the Dependency, Which Mother Did With Limited Success.

¶88 Aside from directly addressing J.C.'s special medical needs, DCS's case plan also focused on Mother's mental health issues and use of substances, calling for Mother to engage in services to alleviate those concerns as an aid to her care for J.C. Early in the case plan, Mother admitted that she felt she needed someone there with her every step of the way to take care of J.C. and that parenting was too overwhelming for her.

¶89 DCS offered Mother Family Connections services and referred Mother for a psychological evaluation, the Nurturing Parenting Program, drug testing, and supervised visitation. Over the next year-and-a-half, Mother engaged in some of these services. For example, in April 2022, Mother began therapy through a new service provider, but only attended six appointments over the months before trial. While originally poor, Mother's engagement in services improved substantially shortly before her termination trial.

¶90 During the dependency, DCS was concerned about Mother's drug use. In March 2022, Mother tested positive for methamphetamine and continued to use marijuana for her anxiety and depression and stress. Though Mother had a medical marijuana card, DCS questioned her marijuana use considering J.C.'s extreme vulnerability and instances of Mother falling asleep while caring for the child, including at supervised visits. DCS referred Mother to Terros for substance-abuse and mental-health treatment. Terros recommended Mother participate in individual,

group, and Medical Marijuana Group therapy and drug testing. Mother minimally attended, however, and her referral closed.

¶91 In August 2022, Mother told DCS she was still struggling with depression, so the case manager referred her for a second psychological evaluation. The psychologist recommended she participate in substance-abuse testing and treatment and establish sobriety for at least six months. Mother did not complete the resulting Terros intake before trial. Mother continued to use marijuana (albeit legally) for her anxiety and depression up to trial. The psychologist also recommended Mother engage in the Nurturing Parenting Program. Mother was halfway through the Nurturing Parenting Program by trial.

¶92 Meanwhile, J.C. improved in the care of her foster family but still had significant special needs, including feeding, speech, physical, and occupational therapies, medical appointments, and behavioral-health services. Doctors determined that J.C. was partially deaf and required hearing aids and speech and hearing services. In September 2021, DCS approved J.C.'s aunt and uncle for unsupervised visits and allowed Mother to attend these visits. Mother did not join them in these extra visits. However, when J.C.'s aunt and uncle and foster family invited Mother to a handful of the child's medical appointments, Mother attended a few of them. A DCS specialist commented unfavorably on Mother attributing her difficulties in engaging with services to her work schedule, and criticized Mother for failing to pursue sign-language learning while J.C.'s foster family had.

¶93 When it later denied termination on the six-months out-of-home care ground, the court would find that Mother "ha[d] not substantially neglected or willfully refused to participate in services, given her recent engagement."

> **1. The Court Terminated Mother's Parental Rights For Neglect and Under the Fifteen-Month-in-Care Ground, Excusing DCS's Failure to Invite Mother to J.C.'s Appointments Because It Would Have Been "Futile" to Do So.**

¶94 On August 29, 2022, DCS moved to terminate Mother's parental rights under the neglect and six-month and fifteen-month out-of-home placement grounds. *See* A.R.S. § 8-533(B)(2), (B)(8)(b)-(c). The court held an evidentiary hearing across two days, December 13, 2022, and

January 11, 2023, before granting the motion to terminate on two of those three grounds in an Under Advisement Ruling on February 3, 2023.

¶95     Before analyzing the grounds for termination in its Under Advisement Ruling, the court made findings about DCS's failure to provide reunification assistance to Mother. The court found that "The Department never advised Mother of the child's medical appointments." The court further found that "Mother at hearings and foster care review board meetings regularly requested to be advised of medical appointments so that she could participate in those appointments and understand the child's medical needs better." The court found these facts irrelevant to its decision to terminate Mother's parental rights with respect to J.C., because the court found that "even if the Department had provided Mother with the dates of those appointments, it would not have moved Mother closer to reunification and would have been futile." The court did not find DCS excused from providing medical appointment-related services to Mother under any of the statutory grounds under A.R.S. § 8-846, nor did the court find that informing Mother of the medical appointments would be "futile" by clear and convincing evidence. Rather, by finding it "unlikely" Mother would have participated in J.C.'s medical appointments, the court found DCS's failure not to invite Mother proper by something more akin to a preponderance of the evidence standard, and thus expressly not by clear and convincing evidence.

¶96     The court ruled that DCS had proven there was a basis to terminate for neglect under A.R.S. § 8-533(B)(2) because it found Mother would not be able "to meet [J.C.'s] medical needs." The court found Mother "did not provide the Child with needed medical care, including obtaining prescriptions, providing appropriate medicines, or learning how to address the Child's particular feeding needs." The court found "Mother is currently unable to meet those medical needs and will continue to be unable to meet those needs" for reasons including Mother's "failure to stay up to date in the child's medical needs . . . ."

¶97     The court denied DCS's motion to terminate under A.R.S. § 8-533(B)(8)(b), the six-month out-of-home placement ground. The court found DCS had made diligent efforts to provide services, including therapy for emotional difficulties, parenting coaching, and substance use-related counseling. As noted, recognizing "Mother's more recent engagement" in services, the court found Mother had "not substantially neglected or willfully refused to participate in services," and thus declined to terminate on this basis.

¶98          The court found DCS had proved by clear and convincing evidence that A.R.S. § 8-533(B)(8)(b), the fifteen-month out-of-home placement ground, justified termination.  The court repeated its finding that DCS had made diligent efforts to provide services that, if successfully completed, would likely have resulted in reunification.  The court found Mother "does not recognize her child's special and medical needs, and ha[d] taken minimal steps to understand those needs or how to best address them."  The court emphasized that Mother's marijuana use had impaired her caregiving and that she continued to use marijuana until just before trial (though apparently legally).  Based on Mother's degree of participation in services, the court found that Mother did not know how to care for her child's "basic or special medical needs" and would not be able to provide proper parental care in the near future.

¶99          Finally, the court addressed whether it was in J.C.'s best interests to terminate Mother's parental rights.  The court found that Mother had "relatively improved parenting skills," "ha[d] made some progress in her ability to interact with her child, and [wa]s clearly bonded."  The court found "[t]here is no question that Mother loves her child."  Despite those findings, the court found J.C. had a foster home "where all of her medical needs can be appropriately provided for," while "Mother has never been able to and will not be able to" provide for J.C.'s medical needs.  The court concluded its decision as one resting on Mother's understanding of J.C.'s medical needs – "[w]hile Mother has had some skills improve, her ability to care for the Child's medical needs have not increased at all."  Because of this failure to understand and address medical needs, the court found it in J.C.'s best interests by the preponderance of the evidence to terminate Mother's parental rights.

¶100          Mother timely appealed.  This court has jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶101          Mother challenges the superior court's determination that DCS made a diligent effort to provide her with appropriate reunification services, given the court's findings that DCS never advised her of J.C.'s medical appointments and that she regularly requested to be kept apprised of them so she could better understand J.C.'s special medical needs. Mother argues that DCS was constitutionally required to make a diligent effort to provide her with reunification services even with respect to its effort to terminate her parental rights under A.R.S. § 8-533(B)(2).  Mother also challenges that severance was in J.C.'s best interests because, she contends,

a correct analysis of the totality of the circumstances would account for DCS's failure to assist her in learning about J.C.'s special medical needs.

**¶102**        DCS argues there is no federal constitutional requirement to diligently support reunification when it alleges abandonment, and that our Legislature's omission from A.R.S. § 8-533(B)(2) of any requirement to provide reunification services is fatal to Mother's position.  In any event, DCS argues, the court was right to apply the futility doctrine to reject her complaint about DCS's failure to ever invite Mother to J.C.'s medical appointments.  Inviting Mother to J.C.'s medical appointments would have been futile because, DCS claims, Mother failed to engage in any services and never attended any service appointments.  Finally, DCS contends Mother failed to challenge the factual premises of the court's best interests finding.   We should reject these arguments and vacate the order terminating Mother's parental rights.

**I.        Terminating Mother's Right to Parent J.C. For Failure to Provide for J.C.'s Medical Needs, While Refusing to Invite Mother to J.C.'s Medical Appointments Even as She Continually Asked to Attend Them, Violated Mother's Constitutional Rights.**

   **A.        The Constitutional Right to Parent Is Fundamental and May Only Be Terminated Where Fundamentally Fair Procedures Provide Due Process, Including Reunification Services.**

**¶103**        Parents have a "fundamental liberty interest in 'the care, custody, and management' of their children" grounded in the United States Constitution.  *Jessie D.*, 251 Ariz. at 579 ¶ 8 (quoting *Santosky*, 455 U.S. at 753).  As the Arizona Supreme Court has reminded us, "it is crucial to remember that parents' right to the custody and control of their children is fundamental and 'does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state.'"  *Id.* at 581 ¶ 17 (quoting *Santosky*, 455 U.S. at 753).  Thus, "'the court [should] sever the parent-child relationship only in the most extraordinary circumstances, *when all other efforts to preserve the relationship have failed*.'"  *See id.* at  581 ¶ 18 (quoting *In re Appeal in Maricopa Cnty. Juv. Action No. JA 33794*, 171 Ariz. 90, 91-92 (App. 1991)) (Arizona Supreme Court's emphasis).  Our supreme court called reunification services "imperative," and made clear DCS is constitutionally required to offer reunification services when it seeks to terminate parental rights.  *Id.*  In particular, the Court approvingly stated that "Arizona courts have previously recognized a requirement to engage in reunification efforts 'on constitutional grounds as *a necessary element of any state attempt* to overcome . . . the fundamental

liberty interest of the natural parents in the care, custody and management of their child.'" *Id.* (quoting *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192 ¶ 32 (App. 1999)) (emphasis added). In other words, all parents hold these constitutional rights, and they do not vanish based upon DCS's choice to proceed under one statutory basis rather than another in seeking to overcome a parent's liberty interest.

¶104 Nevertheless, a parent's right to custody and control of her own child, while fundamental, is not inalienable. *Id.* at 579 ¶ 8. The court may terminate parental rights where "the parents whose rights are to be severed are provided with fundamentally fair procedures that satisfy due process requirements." *Id.* (quoting *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 24 (2005)) (quotations omitted). In a proceeding meeting due process strictures, terminating a parental relationship may be warranted where DCS proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K.*, 210 Ariz. at 284-85 ¶ 25 (citation omitted). The court must also find that severance is in the child's best interest by a preponderance of the evidence. *Id.* at 284 ¶ 22.

> **B. The Key Issue of J.C.'s Dependency and the Court's Termination Order Was Mother's Ability to Learn About J.C.'s Special Medical Needs to Enable Her to Fulfill Them.**

¶105 Mother lost her parental rights because the superior court agreed with DCS that Mother did not understand, and would not learn to fulfill, J.C.'s special medical needs. DCS's intervention here began when "the Department received a report that Mother was unable to medically care for her child." DCS's petition to declare J.C. dependent focused principally on whether Mother could meet J.C.'s special medical needs, and comply with the advice and instruction of an array of medical professionals DCS cited.

¶106 When reporting to the juvenile court, DCS made the centerpiece of its plan for Mother's necessary improvement that she appreciate J.C.'s medical needs, understand her need to support them, get J.C. to medical appointments, and never lapse in being present herself for the appointments. DCS declared these improvements all "necessary in order for [Mother] . . . to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as designed in the case plan)." In other words, to prevail, Mother had to attend all of J.C.'s medical

appointments to learn more about her medical conditions and make sure J.C.'s special needs were met.

¶107    The superior court's order of termination likewise made clear Mother's inability to improve in understanding J.C.'s medical needs was the but-for cause of termination in four ways.  *First*, recognizing that some or all of the grounds for termination in this matter required DCS to diligently provide Mother with reunification services, the superior court's analysis began with the finding that inviting Mother to J.C.'s medical appointments would have been futile because it was "unlikely" she would have attended the appointments.  *Second*, the superior court found neglect proved under A.R.S. § 8-533(B)(2) because of Mother's inability to understand J.C.'s special medical needs, which in turn was demonstrated because Mother had "fail[ed] to stay up to date in the child's medical needs . . . ."  *Third*, the court found A.R.S. § 8-533(B)(8)(c), the fifteen-month out-of-home placement ground, proven in part because Mother "does not recognize her child's special and medical needs, and ha[d] taken minimal steps to understand those needs or how to best address them."  *Fourth*, in defining J.C.'s best interests, the court allowed that Mother greatly loved J.C., and was bonded to J.C., and had made improvements in her parenting skills, but found that "her ability to care for the Child's medical needs have not increased at all."

> **C.    Because Understanding J.C.'s Special Medical Needs Was the Centerpiece of the Case Plan and Termination Proceeding, DCS Was Required to Give Mother a Chance to Attend J.C.'s Medical Appointments.**

¶108    DCS conditioned reunification on Mother's ability to understand and meet the child's medical and special needs.  DCS expected Mother to consistently attend J.C.'s medical and therapy appointments.  Indeed, DCS set up Mother's attendance itself as a criterion for Mother's success or failure in making the improvements needed to reclaim her full parental rights.  Paradoxically, DCS made no efforts to invite Mother to those very appointments, leading the superior court to find DCS "never advised Mother of the child's medical appointments."  We must defer to this finding of fact.  *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002) (explaining that we "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings.").  We must likewise defer to the juvenile court's finding that Mother recurringly sought to be invited to these appointments so she could learn to better understand J.C.'s medical needs.  *Id.*  DCS does not directly challenge these findings of fact in this court.  The majority's suggestion that – boxed out of J.C.'s

appointments – Mother should have learned about J.C.'s special medical needs by reviewing available medical records does nothing to redeem the State's judgment of her for failing to do what it stopped her from doing.

**¶109** Mother argues this failure was a violation of due process. She is right. It is essential that if DCS conditions reunification on a parent's ability to meet her child's medical needs, it must manage the case to give adequate notice to the parent of the child's medical and therapy appointments and allow her the opportunity to attend them. *See Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 50 (App. 2019) ("Although what constitutes a diligent effort will vary by case based on the family's unique circumstances, a diligent effort requires—at the least—DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult.") (emphasis omitted).

**¶110** One of our cases upon which DCS relies in making its futility argument makes this point eloquently. In *Mary Ellen C.*, 193 Ariz. at 192 ¶¶ 34-37, this court reversed a termination of parental rights premised on the mental illness of a mother where DCS's expert had recommended "intensive psychiatric services" that the mother did not receive before her rights were nonetheless terminated. As we explained while reversing that termination in *Mary Ellen C.*, 193 Ariz. at 192 ¶ 37, "[t]he State does not . . . make a 'concerted effort to preserve' the parent-child relationship when it neglects to offer the very services that its consulting expert recommends."

**¶111** A similar logic should control here. This termination came down to whether Mother could learn to address J.C.'s special medical needs, just as the termination in *Mary Ellen C.* was a function of whether the mother could overcome her "serious mental illness." *Id.* at 192 ¶¶ 35-37. Just as DCS's failure to provide Mother with the "intensive psychiatric services" that were that mother's chance to address her mental health struggles required reversal in *Mary Ellen C.*, so is DCS's failure to notify Mother of any of J.C.'s appointments a violation of Mother's constitutional rights. Terminating Mother's parental rights despite the lack of any effort to provide the service core to this judicial proceeding failed to provide Mother with the fundamentally fair procedure and due process our Constitution guarantees her in "any state attempt to overcome . . . the 'fundamental liberty interest'" in parenting one's child. *Jessie D.*, 251 Ariz. at 581 ¶ 18 (quoting *Mary Ellen C.*, 193 Ariz. at 192 ¶ 32). While the Opinion points to other services provided, offering rides to Terros is not a

constitutionally acceptable substitute for refusing to provide the service addressing the core issue of the termination.

**D.** ***Jessie D.* Forecloses DCS's Argument That There Is No Constitutional Requirement of Diligent Efforts to Reunify Where DCS Seeks Termination Under A.R.S. § 8-533(B)(2).**

**¶112**        DCS argues that there is no federal constitutional requirement of efforts to reunify when termination under A.R.S. § 8-533(B)(2) is at issue. The critical passage of *Jessie D.* just discussed resolves that argument.

**¶113**        First, DCS is right that the Legislature omitted to include a requirement of diligent efforts before termination in A.R.S. § 8-533(B)(2) – but the Legislature also omitted that requirement from A.R.S. § 8-533(B)(4), and the Arizona Supreme Court found those efforts constitutionally required. *See Jessie D.*, 251 Ariz. at 581 ¶ 18 ("Although A.R.S. § 8-533(B)(4) does not impose an explicit duty on DCS to provide reunification services, the absence of a statutory duty does not obviate the state's obligation to provide these services.").

**¶114**        Second, our supreme court made clear that this logic extends to "*any state attempt* to overcome . . . the fundamental liberty interest of the natural parents in the care, custody, and management of third child." *Jessie D.*, 251 Ariz. at 581 ¶ 18. (emphasis added) (citations omitted). Far from "read[ing] such a requirement into the neglect and abuse ground," as DCS's brief would have it, this position follows *Santosky* as applied to A.R.S. § 8-533(B) by our supreme court.

**¶115**        Third, *Alma S v. Dep't of Child Safety*, 245 Ariz. 146 (2018), which DCS cites, is not to the contrary. There, our supreme court considered what "inquiry juvenile courts must make to determine whether parental severance is in the 'best interests of the child' for purposes of A.R.S. § 8-533(B)." *Id.* at 148 ¶ 1. The thrust of *Alma S.* is how to conduct a best-interests determination, not construing which subsections of A.R.S. § 8-533(B) require DCS to make diligent efforts toward reunification. *See generally id.* We appreciate and take the guidance from *Alma S.*, cited by DCS, that eight of the eleven statutory grounds in A.R.S. § 8-533(B) are synonymous with unfitness. *Id.* at 150 ¶¶ 9-10 (referring to A.R.S. § 8-533(B)(1)-(4), (8)-(11)). But DCS's entirely correct observation is an unavailing bootstrap because it begs the question before us. Before a finding of any of the statutory grounds in A.R.S. § 8-533(B) (which are indeed synonymous with unfitness), the court must first employ procedures consistent with due process and fundamental fairness. *Jessie D.*,

251 Ariz. at 579 ¶ 8. *Jessie D.*, which came three years after *Alma S.*, made clear that even though a finding of eight of the eleven statutory grounds in A.R.S. § 8-533(B) equate to a finding of unfitness, our courts cannot make a finding of unfitness under its subparts without first requiring a finding of diligent efforts by DCS. *Id.* at 581 ¶ 18.

¶116    In sum, *Jessie D.* requires this court to hold that the lack of any effort by DCS to invite Mother to J.C.'s medical appointments, much less a diligent effort, violates her constitutional right to due process.

II.    **The Superior Court's Finding of Futility Does Not Justify Termination of Mother's Parental Rights or Cure the Violation of Due Process in That Termination.**

¶117    DCS separately contends that the superior court properly found that it was harmless that DCS failed to ever notify Mother of J.C.'s medical appointments because any such invitation would have been futile. A number of cases from this court state that DCS's obligation to provide rehabilitative measures to parents in termination proceedings does not include an obligation to undertake futile measures. *See, e.g., Mary Ellen C.*, 193 Ariz. at 192 ¶ 34; *Maricopa Cnty. Juv. Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 189 (App. 1984). Yet DCS's argument that futility defeats Mother's due process right to DCS including her in J.C.'s medical appointments fails for constitutional, legal, and factual reasons.

A.    **The Court's Finding of Futility Cannot Defeat Mother's Constitutional Right to Diligent Efforts.**

¶118    *Jessie D.* makes clear DCS's invocation of futility cannot overcome Mother's constitutional right to diligent efforts, which must encompass invitations to J.C.'s medical appointments to have any meaning. In *Jessie D.*, 251 Ariz. at 580-81 ¶ 15, the Arizona Supreme Court reversed the superior court's determination that DCS did not need to provide requested rehabilitative services to a father in prison facing termination under A.R.S. § 8-533(B)(4) because the superior court found it would be "virtually, if not completely, impossible in a prison setting" for the father "to build and maintain a bond" with his children. Our supreme court credited the superior court's conclusion that the prison environment made rehabilitation of the parent relationship extremely difficult, writing "maintaining a relationship with one's children while incarcerated would undoubtedly be a difficult task," but nonetheless reversed because it rejected the fatalism that difficulty or improbability excused DCS from supporting that difficult task in the first place. *Id.* at 581 ¶ 17. Our high

court rejected "[t]he juvenile court's rationale and conclusion . . . [as] self-fulfilling and impl[ying] that incarcerated parents could never adequately maintain" their parental relations with their children. *Id.* The court's invocation of futility in this case likewise renders Mother's anticipated failure to learn more about J.C.'s medical needs self-fulfilling. Just as that was impermissible in *Jessie D.*, so it should be here.

**¶119** The Arizona Supreme Court's articulation in *Jessie D.* of the legal rule makes even clearer that DCS cannot invoke futility here to excuse its failure to notify Mother of J.C.'s appointments. In the paragraph of *Jessie D.*, announcing what DCS would be constitutionally required to do going forward, the court mandated rehabilitation services for *all* incarcerated parents seeking services and facing termination proceedings under A.R.S. § 8-533(B)(4), unless the court made a finding that the services themselves would endanger the child. 251 Ariz. at 582 ¶ 21. *Jessie D.* concerned parents who the superior court and the Arizona Supreme Court agreed faced long odds against rehabilitating the parental relationship; it concerned a subpart of A.R.S. § 8-533, which, like (B)(2) here, did not contain any requirement of diligent efforts on DCS's part; and it announced a constitutional rule that rehabilitative efforts were required in *all* cases, save those when it would affirmatively injure the child. *See id.* This rule does not leave room for DCS to throw up its hands after the fact and claim Mother would not have improved in caring for her child's medical needs when Mother is clamoring to attend the child's medical appointments. *See also Santosky*, 455 U.S. at 753–54 ("If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.").

**¶120** It is likewise significant that in the four decades since the futility concept was articulated in our cases concerning termination under A.R.S. § 8-533, the Arizona Supreme Court has never relied on it to justify a termination under this statute. It is our job to follow the guidance of the Arizona Supreme Court. Between *Jessie D.*'s recent articulation of a clear constitutional rule lacking exceptions and a lack of case law employing futility since the U.S. Supreme Court issued *Santosky*, there is no reason to believe the Arizona Supreme Court would circumscribe Mother's rights by using the rubric of futility in this case.

**¶121** Additionally, the superior court's futility finding creates a further constitutional problem that defeats DCS's attempt to rely on it in this court. The fundamentals of due process are notice and an opportunity

to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). The right to services in aid of reunification is necessarily a right that the services occur meaningfully in advance of the evidentiary hearing on termination under A.R.S. § 8-533. *See Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330 ¶ 22 (App. 2007) (explaining that relevant circumstances in termination are those existing at time of trial). As Mother notes, Arizona law has a formal process to justify the extraordinary step of revoking a parent's right to rehabilitative services. *See* A.R.S. § 8-846(D). As Mother also notes, DCS did not invoke that procedure here.

¶122        But when DCS wishes to cease providing services to a parent facing a termination proceeding, the Legislature required several things of DCS that underscore that lack of notice and an opportunity to be heard in this case. DCS was required to make reasonable efforts to provide services to Mother and J.C. under A.R.S. § 8-846(A) unless three things occurred. *First*, DCS was required to ask the superior court for permission not to provide those services. *Second*, DCS was thus required to put Mother on notice that in a proceeding in which her parental rights could be terminated, DCS planned not to provide those services. *Third*, DCS was required to make showings by clear and convincing evidence of the presence of its justifications for not providing services.

¶123        Section 8-846 further illustrates that in termination cases, both the federal Constitution *and* the Arizona legislature's statutory design guarantee Arizona parents the fundamentals of due process, which are notice and an opportunity to be heard. The court's *post hoc* finding of futility in its order terminating Mother's parental rights – with no prior motion to the court, no notice to Mother that the state was renouncing an obligation it might have to her (to allow her to address the matter with the superior court *before* termination), and no clear and convincing evidence standard – failed to provide Mother with notice and an opportunity to be heard. *Holcomb v. Ariz. Dep't of Real Est.*, 247 Ariz. 439, 443 ¶ 11 (App. 2019) ("Procedural due process requires that a party receive notice and the opportunity to be heard at a meaningful time and in a meaningful manner."). Indeed, this court has previously explained that the design of A.R.S. § 8-846 is to do exactly this – to give notice to parents when DCS thinks services are futile, so they can resist that suggestion and be guided accordingly. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 237 ¶ 25 (App. 2011) ("Thus, when applicable under § 8-846, if ADES intends to stop providing reunification services, it is then obligated to bring the issue to the attention of the juvenile court to permit the parents to be heard on the matter."). Our Constitution and our legislature's consistent design that

Arizona parents receive notice when the state chooses to withdraw or not provide reasonable services, require more.

### B. The Superior Court's Finding of Futility Was an Abuse of Discretion.

¶124 The court's finding of futility here was also an abuse of discretion because it was not made by clear and convincing evidence, and because it rests on a foundational factual finding that was not made by clear and convincing evidence. Our seminal case in advancing futility as a basis for not providing services calls for DCS to demonstrate by clear and convincing evidence that the services would have been futile. *Mary Ellen C.*, 193 Ariz. at 193 ¶ 39 ("Nor did the State introduce clear and convincing evidence that additional services would have been futile."). But the court here did not initially claim to have determined futility by clear and convincing evidence. Indeed, by resting its finding that informing Mother of J.C.'s appointments would have been futile because it was "unlikely" she would have attended them, the court necessarily employed a preponderance of the evidence standard.

¶125 Even if one does not read the court's use of "unlikely" in that fashion, the fact remains that the futility finding was a but-for cause of termination and was not determined by clear and convincing evidence. This was error. *See JS-5209 & No. JS-4963*, 143 Ariz. 185 ("[T]he clear and convincing evidence standard employed in parental termination cases[] serves to protect the parent's right from being too easily terminated based upon standards that may not be very precise."). This panel's choice to remand this case more than one year after the superior court decided it so the court could confirm it used the clear and convincing standard in no way changes that court's prior finding that Mother's attendance at J.C.'s medical appointments was merely "unlikely," which is still inconsistent with finding futility by clear and convincing evidence.

¶126 The finding of futility is likewise an abuse of discretion because the record does not support a finding by clear and convincing evidence. It is not our job to reweigh the evidence. *Jessie D.*, 251 Ariz. at 582 ¶ 23. Nonetheless, there is an abuse of discretion here, where we must defer to the juvenile court's finding that "Mother at hearings and foster care review board meetings regularly requested to be advised of medical appointments so that she could participate in those appointments and understand the child's medical needs better." This is precisely the conduct DCS required of Mother. To find it was essentially impossible that Mother could improve as a parent and better understand J.C.'s medical needs when

she was asking to do precisely what DCS wanted and needed her to do does not make sense and is an abuse of discretion. Treating as irrelevant Mother's desire to do exactly what DCS's case plan required of her improperly made DCS's refusal to provide the core assistance its case plan called for a "self-fulfilling" prophecy of Mother's failure. *See Jessie D.*, 251 Ariz. at 581 ¶ 17 (reversing where juvenile court's rationale rendered outcome of proceeding "self-fulfilling" by declining to allow parent opportunity to attempt extremely difficult task of rebuilding parental relationship despite incarceration).

¶127 Mother is right that the court's *post hoc* futility finding, without DCS ever invoking A.R.S. § 8-846 or Arizona Rule of Procedure for the Juvenile Court 340 (allowing any party to "file a motion pursuant to A.R.S. § 8-846 asking the court to relieve DCS of the duty to provide reunification services) was a further abuse of discretion. The juvenile court misapplied the law when it determined in its final order that it would have been futile for DCS to invite Mother to J.C.'s medical and therapy appointments, where DCS failed to move for relief under and prove an aggravating circumstance under A.R.S. § 8-846 by clear and convincing evidence.

¶128 And as already noted, when DCS resolves not to provide services, it is "obligated to bring the issue to the attention of the juvenile court to permit the parents to be heard on the matter." *Christina G.*, 227 Ariz. at 237 ¶ 25. DCS did not do as this court indicated it must in *Christina G.*, which put the superior court unfairly at a disadvantage in managing this case. DCS chose not to notify Mother of J.C.'s appointments, and chose not to raise the matter to the juvenile court by motion. When it later mattered enough to require a futility finding after trial, DCS was properly chargeable under A.R.S. § 8-846 with its prior failure to raise the issue to the juvenile court, as Mother suggests.

¶129 There is likewise an abuse of discretion in the futility finding because its *post hoc* nature robbed Mother of the chance to avoid the superior court's after-the-fact ruling that she could never have learned, even if she had opportunities DCS withheld from her. J.C.'s medical and special needs were the central issue of the dependency. Indeed, J.C. had numerous ongoing appointments with several providers. By not inviting Mother, DCS denied her the time and opportunity to demonstrate her ability—or inability—to consistently attend appointments and to learn about and meet J.C.'s needs. *See Donald W.*, 247 Ariz. at 23 ¶ 51 (DCS failed in its duty to provide services when its "lack of diligence at the onset created the circumstance" preventing reunification).

¶130    One answer to this critique is that while DCS failed to provide Mother with this core part of its case-management service, the juvenile court found it was "unlikely Mother would have participated" in the appointments and determined Mother "had abundant access to the child's medical history and records" from records of this court proceeding but "still had no idea what the child's various medical needs were" at trial. These are negative findings. But they were made in the world in which Mother was functionally disinvited by DCS from the appointments necessary for Mother to mount her disproof. DCS's inaction leaves a large void in the record, such that the court's futility finding is not supported by clear and convincing evidence or a reasonable inference. And as already explained, the juvenile court did not find these foundational facts by clear and convincing evidence:  finding Mother's attendance at appointments "unlikely" doesn't show that fact "by clear and convincing evidence." *See Kent K.*, 210 Ariz at 284-85 ¶ 25 (explaining that "clear and convincing" means "highly probable or reasonably certain.") (citation omitted).

¶131    DCS's arguments in support of these findings are not persuasive. DCS points out Mother attended a few appointments through other relatives, but does not dispute its own failure to notify Mother of appointments while proceeding against her parenting rights on the theory that she needed to attend them and learn about J.C.'s medical needs. DCS asserts that "Mother . . . failed to engage in *any* of the numerous services that DCS provided to her . . ." But that is not the record. The superior court denied DCS's request for termination on the six-month out-of-home ground, affirmatively recognizing "Mother's more recent engagement" in services, and finding Mother had "not substantially neglected or willfully refused to participate in services." DCS's observation that "[a]s with all of the other service appointments, she just did not bother to attend them" likewise does not fairly reflect the record of this matter. True, Mother's participation in services was sporadic, but she began engaging more in the five months preceding trial. Mother's uneven participation must be measured against the choice to seek to revoke her constitutional right to parent J.C. while not notifying Mother of J.C.'s medical appointments. The law does not allow us to relieve DCS of the consequences of that choice. *See Jessie D.*, 251 Ariz. at 584 ¶ 34 (Bolick, J., concurring) ("I trust that in future cases, lower courts will require DCS to facilitate maintaining the parental relationship as it is constitutionally required to do, and that this Court will overturn termination orders where DCS fails to do so.").

¶132    This court should have vacated the superior court's findings that DCS made a diligent effort to provide Mother with appropriate reunification services and that its failure to invite Mother to J.C.'s doctor

and therapy appointments was futile. Because we should have vacated these findings, this dissent does not proceed to address Mother's challenge to the court's finding that severance was in J.C.'s best interests.

## CONCLUSION

¶133 This court should have vacated the superior court's order terminating Mother's parental rights to her child J.C. and remanded to direct the juvenile court to give her a chance to succeed or fail in learning about and caring for J.C.'s special medical needs. If she cannot do so when given a chance, then termination would be proper. Until then, the United States Constitution, as elaborated in *Santosky* and *Jessie D.*, guarantees Mother an opportunity to succeed or fail in learning about her child's special medical needs, and how to care for them. Declaring after a dependency and termination that it was futile to let Mother try at all is not consistent with our Nation's constitutional traditions, fundamental fairness, Arizona's statutory law, or case law.

